Margaret M. Stanish
WRIGHT STANISH & WINCKLER
Nevada No. 4057
300 S. Fourth Street, Suite 701
Las Vegas, NV 89101
Phone:  (702)382-4004
Fax:      (702)382-4800
Counsel for Susanne McAllister

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

### -oOo-

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) Case No. 2:10-cr-00392-GMN-PAL |
| vs | ) **DEFENDANT'S SENTENCING** |
| | ) **MEMORANDUM** |
| SUSANNE MCALLISTER, | ) |
| Defendant. | ) |

         Susanne McAllister, by and through her attorney, Margaret M. Stanish, Wright, Stanish &

Winckler, respectfully requests that the Court sentence her to a community-based sentence, that is

credit-for-time served (one day) and a period of supervised release with conditions deemed

appropriate by the Court.  This is a fair and meaningful punishment given Ms. McAllister's offense

conduct and her personal background.

**1.        Introduction:  Community-Based Punishment Fits the Offense and Person**

         By way of overview, the following factors support a community-based sentence.   First

and foremost, Ms. McAllister's degree of culpability or blameworthiness was extremely low when

compared to others involved in the instant case and those typically convicted in fraud cases.  The

evaluation of her level of culpability is essential to this Court's analysis of the nature of Ms.

McAllister's offense conduct and personal background and characteristics pursuant to Section

3553(a)(1).  At the time of the instant offense, seven years ago, Ms. McAllister was a novice

1  escrow officer assistant who was financially unsophisticated, improperly trained by her

2  supervisors, and exploited by co-defendants.

3       Unlike the co-defendants who devised the mortgage fraud scheme, Ms. McAllister

4  became an escrow officer assistant at Lawyer's Land America Title ["Lawyers Title"] after the

5  scheme was already underway.  She did not seek to be involved in a fraudulent scheme;  rather she

6  did her job by following the escrow procedures and practices consistent with the course of her

7  employment and on-the-job training (or lack thereof).

8       Unlike the co-defendants who devised the scheme and knowingly submitted false loan

9  applications prior to the opening of escrow,  Ms. McAllister had a limited understanding and

10  knowledge of the nature and scope of the mortgage fraud scheme.  She knew that some of the

11  primary occupancy statements executed during the escrow closings were false because the homes

12  would be used for investment purposes. In certain instances, she was aware that Lloyd Gardly (the

13  orchestrator of the scheme)  assisted individuals in buying and selling investment homes, which he

14  would manage as rentals.  In other instances, however, she was unaware of the borrower's

15  connection to the Gardly scheme when serving as notary and processing the escrows.

16       Unlike her co-defendants and uncharged co-schemers whose motives  were greed or a

17  desire to get rich quick, Ms. McAllister was a single mother motivated to maintain employment in

18  support of her family.   At the time, her family obligations included her two-year old daughter, her

19  seriously ill sister, and her sister's two children.   She tried to diligently perform her administrative

20  duties under stressful and demanding work conditions.  While certain defendants obtained large

21  sums of money from the fraudulent loans, Ms. McAllister earned  wages of approximately $1,300

22  every two weeks.  When the lease on her home was about to be terminated,  Lloyd Gardley offered

23  to let her rent a vacant home for $500 a month.  He also lent her $300 for moving expenses which

24  she paid back.

25       Second,  Ms. McAllister's personal history and psychological traits help to explain why

26  she became entangled in the instant offense and provide this Court with essential information in

1   support of a community-based punishment.  (The psychological evaluation by John Paglini, Psy.D.,

2   is appended to the PSI and will not be detailed herein for privacy purposes.)  It shows that Ms.

3   McAllister experienced significant adversities as a child and adult which contributed to her

4   subservient  personality.  The instant offense occurred approximately seven years ago when Ms.

5   McAllister was a hard-working, single mother of one child.   After the end of the instant offense

6   and before the indictment, she became happily married and pregnant with her second child.  She is

7   now the mother of three children  and continues to care for her extended family and others.

8           Third, Ms. McAllister has accepted responsibility for her conduct and assisted the

9   government in its prosecution of two other persons.  She has agreed to pay restitution and forfeiture

10  in amounts far in excess of her "gain."   She has expressed and experienced great remorse for her

11  role in assisting in the escrow process of certain loans.  The government filed a motion for a four-

12  level reduction for substantial assistance and recently amended its recommendation to a two-level

13  reduction.  CR 403 and 425.  In its amended motion, it continues to recommend a two-level

14  reduction for Ms. McAllister's testimony in the trial of co-defendant Jabari Marshall, which the

15  government characterizes as "candid and helpful to the government's case."  CR 425, p.2.

16          The government contends that Ms. McAllister made false statements while testifying on

17  cross-examination in the trial of Theresa Marcianti, one of her escrow officers who Ms. McAllister

18  assisted at Lawyer's Title.  It states, "McAllister made false statements on cross-examination

19  regarding when she lived in one of Lloyd Gardly's houses and regarding whether she participated

20  in fraud after she stopped working for Theresa Marcianti."  The government notes that it will

21  provide the Court with more details regarding the statements if requested.   In brief response

22  herein, the defense takes issue with the government's characterization of her statements as false.

23  Ms. McAllister, acting in good faith, answered the ambiguous and compounded questions posed to

24  her as to why she decided to plead guilty but made mistakes regarding the chronology of events.

25  She did not intentionally provide false statements.

26

1

2

**2.** **The Nature and Circumstances of Ms. McAllister's Offense Conduct and Personal Characteristics**

3

*A. Legal Authority on Relative Culpability as a Sentencing Factor*

4

To meet the goal of tailoring a sentence to fit the person and offense of Ms. McAllister,

5

the Court is urged to consider as compelling mitigation evidence Ms. McAllister's relatively low

6

degree of culpability or blameworthiness in the instant offense.  The fraud guidelines are primarily

7

driven by the amount of loss and do not adequately differentiate the relative degree of

8

blameworthiness or culpability of an individual defendant.  "Loss under the Guidelines is

9

effectively a proxy for evaluating culpability.  Sometimes it is appropriate, and sometimes it is

10

not." United States v. Watts, 707 F.Supp.2d 149, 155 (D. Mass. 2010); *see also,* United States v.

11

Emmenegger, 329 F. Supp. 2d 416,427 (S.D. NY 2004)(finding fraud guidelines place excessive

12

weight on loss when the amount stolen in many cases is a "relatively week indicator of the moral

13

seriousness of the offense or the need for deterrence").  In the instant case, the estimate of actual

14

loss is not an effective proxy in determining the appropriate punishment of Ms. McAllister given

15

her level of culpability.

16

Various courts, the Sentencing Commission, and legal commentators  recognize the

17

tendency of the guideline loss calculations to overstate the seriousness of  an individual

18

defendant's offense conduct.  Indeed, the fraud guidelines provide explicit authority for a

19

downward departure if the Court finds that the fraud guidelines overstates the seriousness of the

20

defendant's offense.   Application Note 19(C) in U.S.S.G., §2B1.1.

21

Both before and after Booker, courts have focused on the nature of the defendant's

22

offense conduct and personal background as a more accurate proxy of culpability.  The case law

23

and commentators make it clear that there is a wide continuum of culpability in fraud cases. And, a

24

just sentence requires the careful analysis of the individual's culpability level to distinguish

25

between the predatory fraudster and an inexperienced person led astray.  *See,* Watt, 707 F. Supp.2d

26

at 155-58 (varying significantly from fraud guidelines based on an evaluation of defendant's

1  relative culpability compared to co-defendant, his motive and intent, and lack of financial gain in

2  computer hacking and identity theft case);  United States v. Forchette, 220 F.Supp.2d 914, 924-27

3  (E.D. Wis. 2002)(citing cases supporting leniency based on evaluation of defendant's "diminished"

4  motive and intent for entering and participating in fraud; inferior role in a fraud; limited knowledge

5  or understanding of the nature and scope of the fraud; limited or no gain; and multiple causation

6  for the actual loss beyond the defendant's conduct).

7          The Forchette Court, a pre-*Booker* case, delineated mitigating circumstances supporting a

8  downward departure when the fraud guidelines substantially overstate the seriousness of a

9  defendant's offense conduct:

10         [T]he defendant may have had a limited or inferior role in the fraud that bore
           little relationship to the amount of the loss; he may have had little or no
11         knowledge of the amount being taken, such that it would be unfair to attribute
           the entire amount of loss to him; his intent in involving himself in the scheme
12         may have been significantly different than that of the usual fraud defendant, e.g.
           he may have entered the scheme with honest intentions or with the intent to
13         make good on his obligations; his fraudulent representations may have been of
           limited materiality, as where he could have obtained a loan by truthful means
14         but at a higher interest rate; or the defendant's fraud may have been for little or
           no gain, especially in comparison to the size of the loss.
15

16  220 F. Supp.2d at 925.

17         Forchette also found that a downward departure from the fraud guidelines may be

18  appropriate when the loss is a result of multiple contributing factors beyond the defendant's

19  control, such as an economic downturn, market collapse, and negligence of others, including the

20  victim. Id. at 924.

21         Similar to the Forchette analysis, the ABA Task Force on the Reform of Federal

22  Sentencing for Economic Crimes[1] has developed a non-exhaustive list of "culpability factors" that

23  _____

24      [1]  The ABA Task Force consists of  federal judges, law professors, attorneys, and an
           observer from the Department of Justice.  The task force is involved in the recent
25         efforts of the Sentencing Commission to conduct a comprehensive revision of the
           fraud guidelines.  The task force's proposal involves revising the fraud guidelines to
26         focus on actual loss, culpability, and victim impact.

1   should be considered in individualizing punishment in fraud and theft cases.   *See,* Statement of

2   James Felman in *Transcript of  U.S. Sent'g Comm'n Symposium on Economic Crimes*, New York,

3   NY (Sept. 18-19, 2013), pp. 108-39, available online at www.ussg.gov.   The ABA task force

4   provided the following non-exhaustive list of  "culpability factors" for consideration: (1) the

5   defendant's motive; (2) the correlation between the amount of loss and the amount of the

6   defendant's gain; (3) the degree of sophistication of both the scheme and the defendant's

7   contribution to the scheme; (4) the duration of the offense; (5) whether the defendant initiated the

8   offense or merely joined in criminal activity initiated by others; (6) whether the defendant

9   voluntarily ceased the offense conduct or mitigated the harm; and (7) whether the defendant

10   committed the offense in response to extenuating circumstances, such as coercion or duress.  Id. at

11   117-23.

12         In reviewing a sentencing in a narcotics case, the Ninth Circuit held that a sentencing

13   court may properly rely upon Section 3553(c)(1) to evaluate  the "nature and circumstances" of

14   each participant's offense conduct in a multi-defendant case and adjust the sentence according to

15   the varying levels of culpability while also taking into account the personal history and

16   characteristics of each defendant.   United States v. Saeteurn, 504 F.3d 1175, 1181-82 (9th Cir.

17   2007).  It found, "Such a comparison, we think, was not to achieve sentencing parity amongst co-

18   defendants but to ascertain exactly what role each defendant had played in the drug conspiracy and

19   impose a correct sentence in the light of each defendant's relative culpability."  Id. at 182.

20         **B.   *Culpability Analysis: The Nature and Circumstances of Ms. McAllister's Offense
         Conduct and Personal Background***

21

22         **Ms. McAllister's Motive, Lack of Sophistication, and Administrative Role**

23         In Summer 2005, Ms. McAllister applied for a job as a secretary at a well-established

24   national escrow company, Land America Lawyer's Title ("Lawyer's Title").  Ms. McAllister was a

25   27-year single mother and living on her own with her daughter who suffered from a heart murmur

26   and a serious respiratory problem that required her to be attached to a nebulizer four times a day.

1   Ms. McAllister had a G.E.D. and no informal or formal training in financing.  Her only personal

2   experience in acquiring loans was as a borrower from payday loan centers and a car loan that she

3   co-signed for her mother.  She was a renter of her residences both before and during the instant

4   offense.

5            Unlike some of the charged and uncharged participants, Ms. McAllister had no

6   meaningful training or experience in the area of fiduciary duties owed to lenders; the intricacies of

7   real estate lending by primary and wholesale mortgage lenders; the innovated loan products made

8   available by the lenders; the reselling of loans to the secondary loan market; or the securitization of

9   loans by certain purported victims who ultimately purchased and bundled the fraudulent loans.

10           The job at Lawyer's Title represented an improvement from her previous job as a

11  receptionist for another escrow company because it paid about $2,400 per month and offered health

12  care benefits which were a necessity given her daughter's condition.  She was assigned to perform

13  secretarial work for an escrow officer who primarily processed the closing paperwork for

14  refinancing mortgages.  A few months into the job, she left Lawyer's Title to accept a better paying

15  position as an escrow assistant at another company.  After one week, however, she returned to

16  Lawyer's Title when she was informed that she was not going to receive the promised health care

17  benefits.

18           When Ms. McAllister returned to Lawyer's Title in or about October 2005, she was

19  assigned to work as an assistant to an escrow officer named Theresa Marcianti.[2]  Her monthly

20  salary was about $2,700.   Unbeknownst to Ms. McAllister,  she had come into a pre-existing

21  fraudulent scheme.   Ms. Marcianti was already performing escrow services for Lloyd Gardly,

22

23       [2]     Ms. Marcienti was not charged in the instant case but was
24              subsequently charged in Case No. 2:11-cr–452-PMP-CWH, which
                involved the escrow processing of a large volume of loans for a
25              realtor and loan broker.  Ms. McAllister did not notarize loans for
                these customers but she processed pay-offs and made distributions as
26              directed.

1    Arcell Mitchell (a loan officer), and others who prepared and submitted loan applications that

2    falsely inflated the borrowers' income, misstated that purchased home would be the primary

3    resident of the borrowers, and other false statements.

4            Ms. McAllister had no involvement in preparing or reviewing the contents of the loan

5    applications.   Her primary function was to order pay-offs from lien-holders, notarize the signatures

6    of sellers and buyers on the closing documents, and distribute funds according to the closing

7    instructions.  These instructions consisted of the lender's instructions, disbursement sheets

8    prepared by the buyers and sellers, and the distribution sheets prepared by the escrow officer based

9    on a review of the lender's instructions and disbursement sheets.   The disbursements of funds

10   would not occur until after the escrow officer reviewed the documents and prepared the

11   disbursement sheets, upon which Ms. McAllister would rely to carry out the disbursement

12   function.   As the assistant to the escrow officer, Ms. McAllister would field phone calls and

13   emails from the clients and their representatives and perform other duties normally expected of an

14   administrative assistant.

15           The Gardly scheme involved approximately 57 fraudulent loans and Ms. McAllister

16   notarized or processed closing in approximately 21 of the loans over the span of approximately two

17   years.   It is important to understand that these loans were interspersed with hundreds, if not

18   thousands, of other escrow closings handled by Ms. McAllister during this time period.  It appears

19   from the voluminous discovery that uncharged escrow personnel at Lawyer's Title and at least

20   three other title companies processed the escrow closings in the majority of the 57 loans associated

21   with the Gardly group.  In short, Ms. McAllister unwittingly took the wrong job at the wrong time.

22                    **Ms. McAllister's "Limited" *Mens Rea* and Personal Traits**

23           Through the course of her employment as an escrow officer assistant, Ms. McAllister

24   occasionally handled escrows that were connected to Mr. Gardly.  She was aware that he helped

25   certain people buy homes that he would manage as investments.  Her decision to plead guilty was

26   based primarily upon her knowledge that certain borrowers were purchasing multiple homes during

1   the same escrow session and certifying that they would occupy the homes as primary residences.

2   This was a practice that Ms. McAllister only recalls observing while working as an assistant to Ms.

3   Marcienti.

4          Despite the recognition that borrowers were purporting to purchase multiple homes as

5   primary residences, Ms. McAllister did not question the propriety of such representations.  As one

6   borrower related to investigators,  when he asked Ms. McAllister about whether such a practice

7   was proper, he recalled her responding, "That's how we do it here."   She understood that the loan

8   documents were already approved by the lenders and her job was to notarize and process the

9   closing documents. She did not think to question or challenge the practice.

10         At the time of the change of plea hearing on March 18, 2013, this Court carefully

11  canvassed Ms. McAllister on whether she understood that the  primary occupancy

12  misrepresentation was material to the lender's decision to lend money. She responded that at the

13  time, she did not know but now she understood it.[3]   She did not think to question the authority of

14  her boss, Ms. Marcianti, or the procedure and practice that was already in place when she began

15  working as an escrow assistant.   As indicated in her statement of acceptance of responsibility,

16  however, Ms. McAllister acknowledged that she should have brought the issue to the attention of

17  the lenders and her conduct aided the scheme.   PSI, p. 11, ¶ 37.

18         As stated above, Ms. McAllister's duties included disbursing funds in accordance to the

19  distribution sheets prepared by the escrow officer.  She did not understand that following the

20  instructions to disburse funds to third parties served to effectuate a part of a fraudulent scheme

21  devised by Mr. Gardly to put money in the pockets of himself and others.  Nor, did she know that

22  some of the third parties were shell companies controlled by Mr. Gardly.

23

24  _____

25      [3]      Your Honor inquired of Ms. McAllister whether she understood that the
                false statements regarding the primary occupancy would influence the
26              decision-making of the lending institutions. Ms. McAllister stated that she
                did not know about the materiality of the misrepresentation at the relevant
                time but learned so afterwards.

1    In sum, Ms. McAllister diligently performed her administrative duties and, in so doing,

2  became ensnared in a fraudulent scheme that she did not fully comprehend.  Moreover, co-

3  defendants, such as Mr. Gardly and Mr. Mitchell, took advantage of her diligence and naivety.  Her

4  *mens rea* was nowhere near as culpable as the co-defendants who devised and profited from the

5  scheme.

6                    **Attenuating Circumstances and Limited Gain**

7    As described in the PSI, the Ms. McAllister's work environment under the supervision of

8  Ms. Marcienti was stressful, fast-paced, and abusive.  Ms. Marcienti was herself operating under a

9  high-level of stress to process the high volume of loans within in the deadlines expected by her

10  customers.  She berated and yelled at Ms. McAllister and her other assistant if they failed to

11  perform to her satisfaction.  The work days were usually 10 hours long and often times Ms.

12  McAllister was required to work on Saturdays.  In Spring 2006, Ms. Marciento lost her temper on

13  one occasion and threw a file at Ms. McAllister, striking her in the head.   This was the last straw,

14  prompting Ms. McAllister to request a transfer to another escrow officer.  Despite the transfer, the

15  work conditions continued to be stressful.

16    Additionally, Ms. McAllister was also under a tremendous amount of stress outside the

17  workplace.  As noted above, her daughter was sickly and required constant medical treatment for a

18  respiratory problems that required her to breath from a respiratory machine four times a day.

19  Medical insurance did not fully cover her daughter's medical care or the equipment.  The

20  biological father provided no child support.  Ms. McAllister was fortunate to have the assistance of

21  her friend, Fannie Rodriguez, and her brother, Mark Nelson, who cared for her daughter while she

22  worked at Lawyer's Title.  (Both Ms. Rodriguez and Mr. Nelson have submitted letters of support

23  for the Court's review.)

24    In or about November 2005, Ms. McAllister's sister needed a helping-hand and Ms.

25  McAllister extended it.   Her sister could not take care of her two children, a nine year old and five

26  year old.  So, Ms. McAllister took in her niece and nephew.  In early 2006, Ms. McAllister's sister

moved into the house also.  The expansion of Ms. McAllister's household and added

10

1   responsibilities placed her under an enormous amount of stress, as more fully described in Dr.

2   Paglini's report at pages 5-6.

3          In or about Spring 2006, Ms. McAllister's landlord informed her the house was going to

4   be sold and the lease terminated.  Ms. McAllister needed to find a new residence.  Lloyd Gardley

5   offered to arrange for her to rent one of the homes that was fraudulently purchased and sitting

6   vacant. (Another staff member at Lawyers Title handled the closing of the escrow on this particular

7   home.)  He gave her a personal check for $300 to pay for moving expenses, which she paid back.

8   She rented the 4,000 square foot home for $500 per month for approximately six months.  During

9   the summertime the electric bill was as high as $500 to $600 per month.  Ms. McAllister had to

10  take payday loans to pay the expenses of the household and twice the electricity was turned off for

11  nonpayment.

12          Despite Ms. McAllister's financial and personal problems, she did not involve herself in

13  the scheme with the motive of gaining a profit.  Instead, she work hard to make a living in an

14  industry that was operating on overload during the real estate frenzy.  Her work days and personal

15  life were frantic and her family obligations were immense.  It is in this context that she became

16  involved in the instant offense.

17          **Weighing the Relative Culpability**

18          To date, the Court has sentenced three of the named co-defendants in this matter.  Arcell

19  Mitchell, was sentenced to nine months imprisonment, three years supervised release, and ordered

20  to pay $365,749.71 in restitution. JOC, CR. 386.  Mr. Mitchell was the loan officer, responsible

21  for submitting false loan applications in the name of various straw buyers.   As a result of his

22  participation in the scheme, he earned commissions in the amount of $260,100, which he was

23  ordered to pay as forfeiture.  Like Ms. McAllister, he pleaded guilty to two mail fraud counts

24  involving the same two homes on Rabbit Trail Street.  (He did not plead to the conspiracy count.)

25  The fraud guideline calculations in both defendants' plea agreements are the same  (base level 7,

26  plus 14 levels for a loss over $400,000).   The government agreed, however, to move for the third

1    point for timely notification of entry of plea by Mr. Mitchell.  PSI, ¶¶ 28-33; Mitchell Plea Memo,

2    CR 88, pp. 2 & 9-10. In contrast, Ms. McAllister entered her plea on March 18, 2013.   The parties

3    agreed that Ms. McAllister did not timely notify the government of her intent to enter a plea and,

4    therefore, the government will not move for the third point for acceptance of responsibility.

5            Sharon Wagner, a real estate agent, was sentenced to 21 months and ordered to pay

6    $323,850 in restitution, and forfeit $67,754, which presumingly represents the amount of her

7    commissions.  CR. 406 and 413.  It appears that Ms. Wagner recruited other stawbuyers and also

8    fraudulently purchased investment homes.  Lloyd Gardly, the orchestrator of the scheme, received

9    a prison sentence of 135 months and a restitution order of $1,445,548.94.  CR. 423.  Ms.

10   McAllister's relative culpability is far less than these defendants and merit a lesser punishment.

11   **3.        Ms. McAllister's Personal Background**

12           Dr. Pagnili's psychological evaluation of Ms. McAllister gives the Court a thorough

13   picture of her history, characteristics, and traits.  The evaluation is, therefore, incorporated by

14   reference herein for the Court's consideration of Ms. McAllister's personal history and the need to

15   impose a sentence that fits her offense conduct and person pursuant to Section 3553(a)(1) and (2).

16   The Court's attention is drawn to pages 16 and 17 of the evaluation which summarizes the

17   numerous mitigation points which support a community based sentence.

18           Additionally, the letters of support from Ms. McAllister's family and friends show that

19   she is a genuinely good person who has soldiered through much adversity in life and become a

20   devoted mother and valuable member of this community.

21           It is unnecessary to incarcerate a woman like Ms. McAllister given these personal traits

22   and taking into account her low level of culpability.  The fraud guidelines significantly overstate

23   measure her culpability in this matter. A community-based sentence does not represent a "mere

24   slap on the wrist."   United States v. Ruff, 535 F.3d 999, 1004 (9th Cir. 2008).  As the Supreme

25   Court noted, probation represents a substantial restriction on a person's liberty.  United States v.

26   Gall, 552 U.S. 38, 43 (2007); *see also,* Ruff, 535 F.3d at 1004.  Indeed, a community-based

1 sentence is a kind of sentence that must be considered under the Sentencing Reform Act as a

2 punishment that may be sufficient, but not greater than necessary, to carry out the goals of

3 sentencing. *See,* 18 U.S.C. 3553(a)(3).

4       And, a community-based sentence is the punishment that is no more greater than

5 necessary to meet the goals of punishment of Ms. McAllister.   She will not recidivate.  The Court

6 has already sent out a strong message of general deterrence to the community by imposing prison

7 sentences on the more culpable persons in the scheme.  To promote respect for the law, it is

8 appropriate to apply a community-based sentence upon Ms. McAllister in recognition of her lower

9 level of culpability and personal history described by Dr. Paglini.

10       Ms. McAllister has agreed to pay a $1,009,750 restitution and forfeit $148,814.22, which

11 the government determined to be the amount of escrow fees earned by her employer.  She will bear

12 the stigma of an ex-felon for life, depriving her of the right to exercise valuable civil rights and

13 substantially impairing her ability to obtain gainful employment.  From a personal standpoint, she

14 is extremely embarrassed by her involvement in the scheme.  The undersigned counsel's legal and

15 factual analysis of her low-level of culpability in no way diminish Ms. McAllister's sense of

16 remorse and acceptance of responsibility.

17       In the words of Martin Luther King, Jr., "The moral arc of the universe bends at the

18 elbow of justice."  A community-based sentence is justice in the light of the sentencing factors.

19

20       DATED this 3d day of January 2014.

21           Respectfully Submitted,

22           _____/s/_____
          MARGARET M. STANISH

23

24

25

26

13

**CERTIFICATE OF SERVICE**

In accordance with 49(c) of the Federal Rules of Criminal Procedures, the undersigned certifies that on the 3$^{td}$ day of January 2014, I caused a true copy of Susanna McAllister's Sentencing Memorandum and Exhibit containing support letters to be electronically served by the U.S. District Court's CM/ECF system to the parties denoted in the Electronic Filing System in this matter.


                                                            /s/
                                                    MARGARET M. STANISH

14